No. 95-3398

Lamb Engineering & Construction       *
Company,                              *
                                      *
                 Appellee,            *
                                      * Appeal from the United States
       v.                             * District Court for the
                                      * District of Nebraska
Nebraska Public Power District,       *
                                      *
                 Appellant.           *

_____

Submitted:  May 13, 1996

Filed:  January 9, 1997
_____

Before McMILLIAN, FAGG and LOKEN, Circuit Judges.
_____


McMILLIAN, Circuit Judge.


Nebraska Public Power District ("NPPD") appeals from a final judgment entered in the United States District Court for the District of Nebraska awarding Lamb Engineering & Construction Co. ("Lamb") $1,129,620 in contract damages. Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist., No. 4:CV94-29 (D. Neb. June 22, 1995) (Judgment) (Lamb Eng'g). For reversal, NPPD argues the district court erred in denying its amended motion for judgment as a matter of law or, in the alternative, for a new trial, interpreting the contract, instructing the jury, and admitting certain evidence.


NPPD also argues the district court erred in awarding attorney fees in the amount of $277,649.50. Id. (Aug. 25, 1995). NPPD argues that the award of attorney fees was contrary to Nebraska law and unsupported by the evidence.

For the reasons discussed below, we affirm in part and reverse in part the order of the district court and remand the case to the district court for a new trial.

## I.  Background

NPPD, a public power district, is a public corporation and political subdivision of the State of Nebraska.  On October 2, 1992, consistent with certain statutory competitive bidding requirements, NPPD opened bids for Contract No. 92-71 (the "contract") for refurbishing and upgrading 65 miles of NPPD's 115 kilovolt transmission line which runs along the Platte River from Columbus to Grand Island, Nebraska.  The transmission line consists of three distinct sections which are separated by substations:  section 1, from Grand Island to Central City; section 2, from Central City to Silver Creek; and section 3, from Silver Creek to Columbus.  The line consists of 523 total structures.

NPPD wrote the contract as a unit-price contract in which estimated quantities of work were provided to bidders in order to compare bids offered under the contract on a uniform basis.  On October 29, 1992, NPPD awarded the contract to Lamb as the responsible bidder who submitted the lowest and best bid of $769,300.  The exact compensation payable to Lamb under the contract was to be determined on the basis of the unit-prices for work actually performed.  On January 18, 1993, Lamb began work on the line, which was to be completed by June 5, 1993.

Lamb encountered difficulties in performing the contract.  The circumstances giving rise to the difficulties are disputed.  Lamb contends that NPPD administered the contract in bad faith, causing Lamb to be unable to fully perform the contract.  Lamb maintains that "[d]uring the evaluation of the several bids, a faction developed within NPPD's System Planning and Engineering Division which opposed awarding the Contract to Lamb."  Brief for Appellee

at 1.  Lamb also maintains that "these same individuals who opposed awarding Lamb the Contract, were given responsibility for administering the Contract and they never relented in their opposition to having Lamb perform the work."  Id. at 2.  Lamb claims that the faction tried to hinder and financially oppress Lamb through the faction's administration of the contract.  Id.

On January 29, 1993, NPPD sent a letter to Lamb seeking assurances that Lamb would timely complete the contract.  Lamb interpreted the letter as a threat that work be accelerated immediately or Lamb would face possible termination, based on the fact that NPPD sent a copy of the letter to Lamb's surety, who was only to be contacted in the event of a termination for default.  Brief for Appellee at 2.  Lamb suggests that NPPD's bad faith administration of the contract is evidenced by the fact that almost immediately after NPPD awarded Lamb the contract, NPPD increased its original estimate of work to be performed by 80%, but refused to extend Lamb's time for performance.  Id. at 2-3.  Lamb maintains that it was entitled to a time extension under the contract's force majeure clause[1] because of the additional work imposed by NPPD and

---

[1]The force majeure clause provided, in pertinent part:

> The CONTRACTOR agrees that ... he has taken into consideration ... all of the ordinary delays due to normally inclement weather, in securing materials or workmen, or otherwise.  In the event that the CONTRACTOR is delayed in the performance of the work as a result of causes beyond his control and which he could not have reasonably anticipated and without his fault or negligence, such as acts of God, fire, flood, war, or governmental or judicial action ..., the time specified in the Contract Documents for completion of the work may be extended for an appropriate period reflecting the actual effect of the delay on the performance of the work...  If the CONTRACTOR encounters extra costs as a result of delays which are beyond his control and which he could not have reasonably anticipated and without his fault or negligence, including those delays which are due to the actions of the DISTRICT ..., the CONTRACTOR shall promptly give the DISTRICT notice ... of such

due to "unexpected and abnormally wet and muddy soil conditions during January through April, 1993." Id. at 3. Lamb claims that NPPD's unwillingness to extend the June 5, 1993, completion date resulted in greatly increased costs to Lamb for labor, equipment, and materials. Id. at 4.

NPPD's description of the circumstances surrounding Lamb's performance is markedly different from Lamb's. NPPD notes that "[a]lthough Lamb characterizes itself as an experienced contractor, it primarily has worked on substations and has had very limited experience with electric transmission lines." Reply Brief for Appellant at 8. NPPD claims that, not only did Lamb's field superintendent have no prior experience with an electric transmission line project, but also Lamb's right-of-way coordinator and material coordinator lacked any experience with such work.[2] Id. at 8-9. As further proof of Lamb's inexperience, NPPD notes that neither Lamb's president nor Lamb's estimator, who prepared the bid, understood the contract's unit-pricing. Id. NPPD maintains that, for these reasons, NPPD's transmission engineering department discouraged awarding the contract to Lamb. Id.

After the contract was awarded to Lamb, however, NPPD claims to have taken "extraordinary steps to assist Lamb on the project," none of which were required under the contract. For example, NPPD allegedly performed an advance ground-level inspection of the line, prepared summary sheets for Lamb showing the expected work at each structure location, contacted landowners to arrange access routes for Lamb, and hired an outside expert to perform aerial inspection work. Id. The ground-level inspection of the line revealed that

---

extra costs.

    Contract No. 92-71, at D-13 to 14.

    [2]Those two positions were assigned to the 18- and 21-year-old sons of Lamb's president. Reply Brief for Appellant at 9.

more poles required replacement than anticipated, resulting in an increase of approximately 11% over the original work estimate contained in the contract, with a total price increase of approximately $85,403. NPPD suggests that "Lamb's president mistakenly interpreted this increase to apply only to the first section of the line," rather than to the total contract. Id. at 10. NPPD claims that due to "Lamb's lack of progress during the first month of the project and the continued failure of Lamb's project manager to deliver required construction schedules to NPPD," it sent Lamb the January 29, 1993, letter seeking assurance that Lamb intended to complete the project on time. Id. NPPD maintains that the letter "expressly advised Lamb that the transmission line needed to be returned to service by the scheduled June 5th completion date in order to handle NPPD's increased summer load," and thus no extensions would be granted. Id.

NPPD maintains that the force majeure clause did not apply to the difficulties encountered by Lamb. At trial, NPPD presented extensive expert testimony by a meteorologist and a geotechnical engineer that "the precipitation, temperature, groundwater, and soil conditions experienced on the project were typical of conditions along the Platte River in Nebraska during winter and spring, and should reasonably have been anticipated by Lamb." Id. at 11. NPPD claims that it informed Lamb that, even though the force majeure clause did not apply, Lamb had the right under the contract to stop work if the weather or soil conditions were unsuitable. Id. In March 1993, NPPD notified Lamb that it should simply perform as much work as possible before June 5th. Id.

In March 1993, Lamb and NPPD negotiated a tentative "standby" agreement by which Lamb would temporarily shut down the project due to the weather and soil conditions. Lamb claims that the agreement was finalized, thus justifying Lamb's decision to send its crews home on March 17. Brief for Appellee at 5. NPPD asserts, however, that the terms of the agreement were subject to further review of

-5-

applicable labor and equipment rates.  Reply Brief for Appellant at 11.
NPPD argues that it was justified in rejecting the "standby" agreement
because it had not been reduced to writing and faxed to Lamb for
modification or execution as agreed.  Id.

In April 1993, Lamb's performance increased as the weather and soil
conditions improved.  On April 21, 1993, NPPD suggested in a letter to Lamb
that all work in section 3 of the transmission line be deleted from the
contract, as Lamb had not yet begun any of that work.  Lamb rejected the
proposal and on May 6, 1993, demanded that it be allowed to perform the
work on section 3 as provided in the contract.

On May 7, 1993, NPPD gave Lamb written notice that it was terminating
the contract under the contract's termination clause, which provided:

> The DISTRICT may at any time, and without cause,
> terminate this Contract by mailing a written notice
> thereof to the CONTRACTOR at the address given in the
> Proposal Section of these Contract Documents.  Upon any
> such Termination, the DISTRICT shall pay the CONTRACTOR
> reasonable and proper charges for termination.

Contract No. 92-71, at D-12.  As of that date, Lamb had partially performed
its work under the contract on the first two sections of the transmission
line.  Lamb had performed work on 262 of the 523 structures on the
transmission line and had completed work on 123 of those structures.

During the project, Lamb submitted four progress payment invoices for
work performed through February 24, 1993, March 17, 1993, April 7, 1993,
and April 23, 1993.  NPPD made adjustments to the invoices and deducted a
5% retainage fee, ultimately paying Lamb $260,991.22.  Lamb also submitted
an invoice to NPPD for state use taxes in the amount of $969.44, which NPPD
paid in full on

June 30, 1993.  Lamb submitted additional invoices for:  claimed extra work in preparing the transmission line for re-energization and in demobilizing before the temporary shutdown of the project in mid-March 1993, totalling $36,473.00;  "standby" costs during the temporary shutdown and remobilization costs totalling $83,755.50; "down time" or "force majeure" costs totalling $186,817.33; and "acceleration" costs totalling $122,764.74.  Lamb refused to accept partial payment tendered by NPPD for the claimed costs associated with the temporary shutdown, namely, demobilization costs of $5,416.00 and standby costs of $25,907.40.  NPPD denied the remaining invoices.

Following the termination of the contract, Lamb submitted three "termination" invoices, apparently for costs in addition to those included in the progress payment invoices submitted during the project.  These termination invoices included labor, equipment, and material charges for the entire project, totalling $1,239,817.20.  NPPD refused to pay the termination invoices and requested that Lamb submit invoices for any unpaid unit-price work and for any reasonable and proper termination charges, as provided by the contract.

Lamb originally filed its complaint in the United States District Court for the District of Utah on September 2, 1993, and subsequently amended it twice.  NPPD's motion to dismiss for lack of jurisdiction was denied, but the district court granted NPPD's motion to change venue to the United States District Court for the District of Nebraska.

In its second amended complaint, Lamb alleged:  (1) breach of contract for wrongful termination; (2) account stated for reasonable and proper charges for termination, including profit and post-termination demobilization charges; and (3) unjust enrichment in an amount equal to the reasonable value of materials and services furnished.  NPPD answered and asserted a counterclaim,

-7-

seeking: (1) a declaratory judgment establishing the amount due to Lamb for work performed under the contract based on unit-prices and any other "reasonable and proper charges for termination" under the contract; and (2) judgment awarding damages in favor of NPPD for all cleanup costs, restoration costs, property damages, and rework costs for which Lamb was responsible under the contract.

Upon review of NPPD's Motion for Partial Summary Judgment, the district court granted the motion in part, holding that NPPD did not breach the contract by "enlarging the scope of work" or wrongfully terminate the contract. Lamb Eng'g, slip op. at 7 (Feb. 15, 1995). However, the district court denied NPPD's motion for partial summary judgment with respect to Lamb's second and third causes of action. Id.

During the course of the trial, Lamb's first and third causes of action and NPPD's counterclaim were voluntarily dismissed. Only Lamb's account stated claim was submitted to the jury. The district court submitted, over NPPD's objections, a special interrogatory to the jury to determine whether NPPD acted in bad faith in administering the contract. Tr. at 3865:22-3866:13. The jury returned a verdict in favor of Lamb for $1,129,620.00 in damages and responded affirmatively to the special interrogatory, finding that NPPD administered the contract in bad faith. The district court denied NPPD's motion for judgment as a matter of law or, in the alternative, for new trial. The district court subsequently granted Lamb's motion for an award of attorney fees based on the jury's finding of bad faith or alternatively, on the district court's own finding of bad faith. Lamb Eng'g, slip op. at 1 (Aug. 25, 1995). NPPD appeals.

## II. Discussion

### A. Trial Errors

NPPD contends that various errors committed by the district court entitle it to judgment as a matter of law or, in the alternative, a new trial. For clarity, we consolidate NPPD's issues on appeal and address the purported errors by the district court. "We review the district court's denial of a motion for judgment as a matter of law de novo using the same standards as the district court." McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994) (citations omitted). A motion for judgment as a matter of law presents us with a legal question on review: "whether there is sufficient evidence to support a jury verdict." Id. NPPD argues that the district court erred in denying its motion for judgment as a matter of law because Lamb failed to prove any reasonable and proper charges for termination. We do not find it appropriate to grant judgment as a matter of law in favor of NPPD because the reasonable and proper charges for termination must be decided by the factfinder on remand.

We review a district court's denial of a new trial motion for an abuse of discretion. Farmland Indus., Inc. v. Morrison-Quirk Grain Corp., 54 F.3d 478, 483 (8th Cir. 1995). We will reverse the District Court's decision if it "represents a clear abuse of discretion or a new trial is necessary to avoid a miscarriage of justice." Id. For the reasons stated below, we hold that the erroneous instruction of the jury regarding damages and contract interpretation and the erroneous admission of evidence regarding expected loss of gross margin, total costs, and breach of contract costs were sufficiently prejudicial to warrant setting aside the jury's award of damages and require a new trial. Accordingly, we affirm in part and reverse in part and remand this case to the district court for a new trial on damages, to be submitted to the jury in a manner consistent with this opinion.

<u>Damages Under the Contract's Unit-Price Provision</u>

The interpretation of a contract presents a question of law to be reviewed <u>de novo</u>. <u>See</u> <u>Simeone v. First Bank Nat'l Ass'n</u>, 971 F.2d 103, 106 (8th Cir. 1992); <u>International Union of Operating Eng'rs Local 571 v. Hawkins Constr. Co.</u>, 929 F.2d 1346, 1348 (8th Cir. 1991).

NPPD argues the district court erred in ruling that "[w]hether the contract was a unit-priced contract does not govern matters of damage under the termination clause." <u>Lamb Eng'g</u>, slip op. at 2 (Aug. 23, 1995). NPPD contends the district court should have construed the termination clause in conjunction with the other payment provisions in the contract.[3] A contract must be construed as a whole, and "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." <u>Rafos v. Outboard Marine Corp.</u>, 1 F.3d 707, 709 (8th Cir. 1993). We agree with NPPD that the unit-price provision governs payment owing under this contract for work already performed by Lamb. Thus, evidence concerning work performed, for which Lamb was paid by NPPD, is irrelevant and inadmissable on remand. Damages for work performed, for which Lamb has not been paid, must be calculated pursuant to the contract's unit-price provision. That amount is equal to Lamb's unit bid price multiplied by the quantity of work performed by Lamb. <u>See</u> Contract No. 92-71, at C-3.

---

[3]Contrary to Lamb's assertion, Brief for Appellee at 12, NPPD properly preserved its objection to the district court's interpretation of the termination clause. <u>See</u> Answer and Countercl., App. for Appellant at 19-35; Mtn. in Limine, Supplemental App. for Appellant at 110-115; Pretrial Conference Order, App. for Appellee at 121-25; and Mtns. for Judgment Notwithstanding the Verdict and Alternatively New Trial, Appellant's Addendum at 15.

## Damages for Future Profits

NPPD also argues the district court erred in admitting expected loss of gross margin evidence. We agree.

The contract's termination clause provided:

> The DISTRICT may at any time, and without cause, terminate this Contract by mailing a written notice thereof to the CONTRACTOR at the address given in the Proposal Section of these Contract Documents. Upon any such Termination, the DISTRICT shall pay the CONTRACTOR reasonable and proper charges for termination.

Contract No. 92-71, at D-12. Under Nebraska law, loss of profit damages may be awarded only where a wrongful termination occurred. Von Dorn v. Mengedoht, 59 N.W. 800, 802 (Neb. 1894) (cited with approval in Kroeger v. Franchise Equities, Inc., 212 N.W.2d 348, 349 (Neb. 1973)); accord Makskym v. Loesch, 937 F.2d 1237, 1245 (7th Cir. 1991) (When a contract is "terminated by either party without breach or liability, the only money owing to either is money that has accrued from the past performance of the contract."). Here, the termination clause explicitly gave NPPD the right to terminate the contract "at any time and without cause."

The district court also erroneously instructed the jury on damages by permitting the jury to "consider all the circumstances, including the amount of work expected to be performed ... and any other factors that are shown by the evidence and that bear on the issue on what charges for termination are reasonable and proper." Appellant's Addendum at 8 (emphasis added). Because a damage award for loss of expected gross margin is contrary to Nebraska law, the district court abused its discretion in admitting this evidence and allowing the jury to consider it in determining damages.

<u>Reasonable and Proper Charges for Termination</u>

NPPD also argues the district court erred in instructing the jury to determine the meaning of the termination clause.[4] NPPD specifically objects to the district court's instructions that "any doubt concerning the meaning [of the contract] must be resolved against the party that drafted the contract language [NPPD]," and the jury should interpret the contract in a way which will prevent "oppressive or inequitable results." Tr. 3866:14-3867:25. Under Nebraska law, the proper construction of a written contract is a question of law to be determined by the court. <u>Swanson v. Baker Indus., Inc.</u>, 615 F.2d 479, 483 (8th Cir. 1980). Where a provision in a written contract is not ambiguous, the trial court must determine its meaning as a matter of law, and not submit the issue to the jury. <u>Smith v. Wrehe</u>, 261 N.W.2d 620, 625 (Neb. 1978).

Here, the district court found that the termination clause was unambiguous. <u>Lamb Eng'g</u>, slip op. at 3 (May 26, 1995). Because the contract was unambiguous, the district court committed reversible error in submitting the issue to the jury. See <u>United States Fire Ins. Co. v. Pressed Steel Tank Co., Inc.</u>, 852 F.2d 313, 316-17 (7th Cir. 1988).

We read the unambiguous provision in the termination clause providing for the "reasonable and proper charges for termination" to include only those reasonable and proper expenses incurred, or disbursements made, in connection with the termination. See BLACK'S LAW DICTIONARY 233 (6th ed. 1990) (defining charges as "[t]he expenses which have been incurred, or disbursements made, in connection with a contract, suit, or business transaction"). The determination of which expenses incurred, or disbursements made, in

---

[4]After examining the trial transcript, we reject Lamb's contention that NPPD did not properly object to the jury instruction regarding contract interpretation. See Tr. at 3779:20-3780:5; 3782:20-3783:13.

connection with the termination were reasonable and proper is a question of fact for the factfinder.

We agree with NPPD that the district court abused its discretion in admitting total costs evidence. This court gives "great deference to a district court's rulings on admissibility of evidence and will reverse only if the court has committed a clear abuse of discretion." United States v. Jackson, 914 F.2d 1050, 1053 (8th Cir. 1990). Furthermore, we will not disturb a jury's verdict "absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result." O'Dell v. Hercules, Inc., 904 F.2d 1194, 1200 (8th Cir. 1990). Lamb's total costs evidence, showing the magnitude of Lamb's expenses during the entire project, is irrelevant to the determination of the reasonable and proper expenses incurred, or disbursements made, in connection with the termination.[5]

NPPD argues the district court erred in admitting Trial Exhibits 112 and 113 and William Schwartzkopf's testimony

---

[5]We address additional reasons that the testimony and exhibits used to present the total cost evidence was inadmissible, since the issue may recur on remand. Trial Exhibit 293, dated May 15, 1995, was a report prepared by Bruce Wisan, a certified public accountant, for Lamb's attorney just weeks before trial. The report explicitly indicated that it was prepared solely for use in the Lamb and NPPD litigation, thus, it is does not qualify as a business record under Fed. R. Evid. 803(6) as an exception to the hearsay rule. See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2d Cir. 1994); Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1258-59 (9th Cir. 1984). Similarly, Wisan's testimony, which was based upon his personal review and audit of Lamb's costs records, was inadmissible without Wisan's designation as an expert witness because his testimony was based upon the report he prepared for use in the litigation and not in the ordinary course of business. See Burlington N. R.R. v. Nebraska, 802 F.2d 994, 1004-05 (8th Cir. 1986).

concerning them.[6]  Trial Exhibit 113 lists two methods for calculating the reasonable and proper termination charges.[7]  App. for Appellee at 256.  The Termination Invoices method is based upon Lamb's termination invoice requests, minus payments Lamb received for completed work.  The Cost Method is based upon Lamb's adjusted costs, overhead, profit, owned equipment value, and loss of gross margin on uncompleted work, minus payment already received for completed work.  Evidence admitted for purposes of the jury's determination of reasonable and proper termination charges must be relevant to the reasonable and proper expenses incurred, or disbursements made, in connection with the termination, and shall not include lost profits, costs incurred which had already been reimbursed at the time of the termination, or costs that are not connected with the termination.

NPPD also argues the district court erred in admitting Trial Exhibits 185, 193, and 196 ("termination" invoices), Trial Exhibits 139, 141, and 165 ("force majeure" or "down time" invoices), Trial  Exhibit 171 ("acceleration" invoice), and testimony regarding those trial exhibits. Lamb admits in its brief that this evidence was admitted as relevant to its breach of contract claim, which was subsequently withdrawn.  Brief for Appellee at 21.  Lamb argues that this evidence remained relevant to the termination clause claim to "show the magnitude of the increase in Lamb's costs resulting from performing its work in the changed and abnormally severe conditions."  Id.

While NPPD failed to request a limiting instruction regarding this evidence and its questionable applicability to the termination

---

[6]After reviewing the trial transcript, we reject Lamb's assertion that NPPD did not object to the admission of this evidence.  See Tr. at 1765:23-1766:5; 1761:2-6; 1769:15-17.

[7]The contents of Trial Exhibit 112 are duplicated in Trial Exhibit 113.  For simplicity, we address only Trial Exhibit 113, but our findings apply to both Trial Exhibits.

clause damages, we find NPPD's initial objection to the relevancy of the evidence sufficient to preserve this issue for appellate review.  This evidence was relevant only to the breach of contract claim and should not have been admitted to determine damages owed under the termination clause.

"That these errors caused, or contributed to, a prejudicial conclusion is obvious when one considers the jury verdict."  GFH Fin. Serv. Corp. v. Kirk, 437 N.W.2d 453, 460 (Neb. 1989) (finding obvious error where "[t]he language of this instruction allowed the jury to consider a total damages figure before any credits were given for the 'reasonable sales value' of the equipment, it allowed the jury to consider storage fees which were not recoverable under the lease, and it allowed the jury to consider the attorney fees expended by the plaintiff when such fees are not recoverable under the laws of the State of Nebraska").  Any money owed by NPPD to Lamb for work already performed must be calculated using the contract's unit-price provision.  Damages available under the reasonable and proper termination charges provision are limited to the reasonable and proper expenses incurred, or disbursements made, in connection with the termination.

Because the jury returned only a general verdict, it is impossible to determine whether the inadmissible evidence did not affect the verdict, See Square Liner 360°, Inc. v. Chisum, 691 F.2d 362 (8th Cir. 1982), therefore warranting a new trial.  A new trial is also required because the district court improperly allowed the jury to interpret an unambiguous contract.  See Green Tree Acceptance, Inc. v. Wheeler, 832 F.2d 116, 117-18 (8th Cir. 1987) ("Because we cannot be confident that the jury verdict was not tainted by the erroneous and prejudicial submission of an unambiguous contract for jury interpretation, we reverse and remand

for a new trial.").[8]  Finally, a new trial on the issue of damages is warranted based on the district court's erroneous submission of the bad faith special interrogatory to the jury.[9]  See Libbey-Owens-Ford Co. v. Insurance Co. of N. Am., 9 F.3d 422, 427 (6th Cir. 1993) ("One ground for a new trial is the submission to the jury of an issue not appropriate for its consideration.")[10]; see also Feldman v. Connecticut Mut. Life Ins. Co., 142 F.2d 628, 634 (8th Cir. 1944) ("[T]he submission of an improper special interrogatory, or the submission of a special interrogatory without such explanation or instruction as will enable the jury competently to answer it, manifestly may constitute reversible error where the record is convincing that the answer made to the special interrogatory has determined the result of the jury's general verdict.").  For these reasons, we reverse the damages award and remand the case to the district court for a new trial on the issue of damages.[11]

B.  Attorney Fees Award

It is not clear whether the district court awarded attorney fees to Lamb under state law or federal law.  Thus, we address the

---

[8]We reject Lamb's assertion, Brief for Appellee at 25-26, that because NPPD failed to request a special interrogatory to determine upon which method of costs the jury relied, NPPD cannot show prejudice sufficient to warrant a new trial.

[9]After reviewing the record, we find, contrary to Lamb's assertion, Brief for Appellee at 45, that NPPD did properly object to the submission of the bad faith issue to the jury.  Tr. at 3779:1-10; 1867:22-1868:20; 1869:11-16; 1870:23-1871:8.

[10]The bad faith issue was erroneously submitted to the jury for the reasons discussed under the attorney fee award issue.

[11]We reject Lamb's claim that NPPD did not properly assert the grounds which warrant a new trial, as NPPD's brief incorporates the grounds asserted in its Amended Motions for Judgment Notwithstanding the Verdict and Alternatively New Trial.  App. for Appellant at 93-100.

propriety of the award under both state and federal law.[12]  For the following reasons, we vacate the district court's award of attorney fees.

Nebraska Law

NPPD maintains that Nebraska law does not authorize attorney fees for bad faith pre-litigation conduct.  We agree.

We review the district court's application of state law to the facts de novo.  Price v. Seydel, 961 F.2d 1470, 1475 (9th Cir. 1992) (Price); see also Actors' Equity Ass'n v. American Dinner Theatre Inst., 802 F.2d 1038, 1042 (8th Cir. 1986) (Actors' Equity Ass'n) ("The legal principles that the court relies on to inform its discretion [in awarding attorney fees], however, are subject to de novo review.").  In a diversity case "where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."  Alyeska Pipeline Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31 (1975) (Alyeska); see also Price, 961 F.2d at 1475 (a federal court applies state law in awarding attorney fees when those fees are connected to the substance of the case); Public Serv. Co. v. Continental Cas. Co., 26 F.3d 1508, 1520 (10th Cir. 1994) (the right to recover attorney fees is substantive and thus determined by state law in diversity cases); Ross v. Inter-Ocean Ins. Co., 693 F.2d 659, 661 (7th Cir. 1982) (the right to attorney fees in a diversity action is governed by

---

[12]In its motion for an award of attorney fees, Lamb asserted its entitlement to the award "under applicable federal and/or state law relating to bad faith pre-litigation or litigation conduct." App. for Appellant at 80, 83.  The district court specified in its Order that it granted attorney fees "on the basis of bad faith pre-litigation conduct and not on the basis of litigation conduct." Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist., No. 4:CV94-29 (D. Neb. Aug. 25, 1995) (Lamb Eng'g).

state law); <u>Shelak v. White Motor Co.</u>, 636 F.2d 1069, 1072 (5th Cir. 1981) ("[I]n an ordinary diversity case, state rather than federal law governs the issue of the awarding of attorney's fees."); <u>Western Sur. Co. v. Lums of Cranston, Inc.</u>, 618 F.2d 854, 855 (1st Cir. 1980) ("[B]ecause jurisdiction in this case rested upon diversity of citizenship, state law would govern an award of attorney's fees.").

Nebraska law allows the recovery of attorney fees only where such recovery is provided by statute or where the uniform course of procedure has been to allow such recovery. <u>Holt County Coop. Ass'n v. Corkle's, Inc.</u>, 336 N.W.2d 312, 315 (Neb. 1983) (<u>Holt County Coop. Ass'n</u>). We find no Nebraska statute which provides for recovery of attorney fees in a contract action.[13] Nor do we find that Nebraska has adopted a course of procedure by which attorney fees may be awarded in this case. Although the Nebraska Supreme Court has recognized a court's inherent power to award attorney fees against a party based on its bad faith, such an award is limited to cases in which the bad faith pertains to conduct <u>during the course of</u> litigation. <u>Id.</u> (emphasis added). The district court explicitly awarded attorney fees "on the basis of bad faith pre-litigation conduct and not on the basis of litigation conduct." <u>Lamb Eng'g</u>, slip op. at 1 (Aug. 25, 1995). We hold that such an award of attorney fees is contrary to Nebraska law. We further opine that the Nebraska Supreme Court would not extend <u>Holt County Coop. Ass'n</u> to include such pre-litigation conduct. In <u>City of Gering v. Smith Co.</u>, 337 N.W.2d 747 (Neb. 1983), the Nebraska Supreme Court refused to extend its prohibition concerning the

_____

[13]Neb. Reissue Rev. Stat. § 25-824 (2), (4) (1995), provides for attorney fee awards based on bad faith <u>litigation</u> conduct. This statutory attorney fee provision was enacted by the Nebraska Legislature subsequent to the Nebraska Supreme Court's 1983 decision in <u>Holt County Coop. Ass'n v. Corkle's, Inc.</u>, 336 N.W.2d 312 (Neb. 1983).

-18-

allowance of attorney fees beyond that provided in <u>Holt County Coop. Ass'n</u>.


<u>Federal Law</u>


NPPD also argues the district court's inherent power to award attorney fees for bad faith is inapplicable because in this case the bad faith conduct was pre-litigation conduct.  We agree.


> We review the District Court's award of attorney fees <u>de novo</u>. Once the trial court has made a finding of bad faith, an award of attorneys' fees is within its discretionary power and will not be disturbed absent an abuse of discretion.  The legal principles that the court relies on "to inform its discretion, however, are subject to de novo review."

<u>Actors' Equity Ass'n</u>, 802 F.2d at 1042 (citations omitted).


Federal courts have the inherent power to assess attorney fees in narrowly defined circumstances, despite the so-called "American rule," which prohibits fee shifting in most cases.[14]  <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45 (1991) (<u>Chambers</u>).  Courts have established limited exceptions to the American rule, however, such as "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[15]  <u>Id.</u> at 45-46 (quoting other cases).  Federal courts sitting in diversity can use their inherent power to assess attorney fees as a sanction for bad faith conduct even if the applicable state law does not recognize the bad

---

[14]The American rule on the award of attorney fees in federal litigation is well-settled in its requirement that, absent a statute or an enforceable contract, each party is responsible for its own fees.  <u>Actors' Equity Ass'n v. American Dinner Theatre Inst.</u>, 802 F.2d 1038, 1041 (8th Cir. 1986) (citing <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247, 257 (1975)).

[15]For simplicity, we recognize this standard as the "bad faith exception" to the American rule.

faith exception to the general rule against fee shifting. Id. at 51-52. In the present case, we examine the district court's inherent power to award attorney fees for bad faith pre-litigation conduct.

A court's inherent power to award attorney fees pursuant to the bad faith exception "depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation." Id. at 53 (emphasis added). This court has recently adopted the view promulgated by various circuits that, in determining whether to award attorney fees based on the litigant's bad faith, "'[t]he court may consider conduct both during and prior to the litigation, although the award may not be based solely on the conduct that led to the substantive claim.'" McLarty v. United States, 6 F.3d 545, 549 (8th Cir. 1993) (McLarty)[16] (quoting Perales v. Casillas, 950 F.2d 1066, 1071 (5th Cir. 1992)); accord Association of Flight Attendants v. Horizon Air Indus., Inc., 976 F.2d 541, 548-50 (9th Cir. 1992) (Association of Flight Attendants); Shimman v. International Union of Operating Eng'rs, Local 18, 744 F.2d 1226, 1233 (6th Cir. 1984) (Shimman), cert. denied, 469 U.S. 1215 (1985).

Lamb relies upon Yonker Constr. Co. v. Western Constr. Corp., 935 F.2d 936, 942 (8th Cir. 1991) (Yonker Constr. Co.), as well as Richardson v. Communication Workers, 530 F.2d 126, 132 (8th Cir.) (Richardson), cert. denied, 429 U.S. 824 (1976), in arguing that

_____

[16]McLarty v. United States, 6 F.3d 545 (8th Cir. 1993), involved the recovery of attorney fees against the government under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(b), which authorizes an award of attorney fees to a prevailing party where the government's position is not substantially justified. Consistent with a court's inherent power to award attorney fees against a litigant guilty of bad faith, attorney fees are awarded under the EAJA where the government has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." Id. at 549. Under the EAJA, the government is liable for fees and expenses to the same extent as any other party under the common law. Id.

the court has the inherent power to award attorney fees for bad faith prefiling conduct. In Yonker Constr. Co., we held that "[b]ad faith may occur during either contract performance or litigation." 935 F.2d at 942. In Richardson, we allowed recovery of attorney fees under the bad faith exception based on a labor union's intentional failure to discharge its fiduciary duty to represent plaintiff in his grievance and its actual inducement of his wrongful discharge. 530 F.2d at 133.

We take this opportunity to clarify and distinguish these cases in light of McLarty. In McLarty, this court acknowledged that in determining a litigant's bad faith, the court may consider conduct both during and prior to the litigation, but it may not base an award solely on the conduct that led to the substantive claim. 6 F.3d at 549. The Sixth Circuit explained this rule by stating that fees awarded under the bad faith exception "are designed to punish the abuse of the judicial process rather than the original wrong." Shimman, 744 F.2d at 1232 n.9. Thus, "[a] person who harms another in bad faith is nonetheless entitled to defend a lawsuit in good faith." Id. at 1232. In Yonker Constr. Co., the jury found that the defendant acted in bad faith in performing the subcontract and in initiating its counterclaim. 935 F.2d at 942. We recognize the filing of a counterclaim as litigation conduct.

We similarly distinguish Richardson, in which attorney fees were awarded for defendant Unions' failure to represent the plaintiff in grievance proceedings and its inducement of the plaintiff's discharge. 530 F.2d at 133. We presume, without commenting on whether we agree, that the Richardson panel found the grievance proceedings to be akin to litigation conduct. Similarly, the Ninth Circuit has distinguished Richardson from the line of cases from which McLarty evolved on the basis that Richardson involved both bad faith in refusing to recognize a clear legal right, thus necessitating that an action be filed and justifying an

award of attorney fees, and bad faith in the conduct underlying the cause of action, which alone, under McLarty, would not justify an award of attorney fees.  See Association of Flight Attendants, 976 F.2d at 549.[17] In other words, Richardson is an "exceptional case," id., because, in that case, defendant Unions refused to provide legal representation despite its clear obligation to do so, thus making litigation inevitable.  Thus, the attorney fees award in Richardson was not based solely on the conduct that led to the substantive wrongful discharge claim.  See McLarty, 6 F.3d at 549.

We find support for our holding today implicitly in the language of the Chambers majority opinion and explicitly in the dissenting opinions. Justice Kennedy's dissent in Chambers is not based so much upon a differing view of the rule regarding attorney fees for bad faith litigation conduct, but instead on a different interpretation of the district court's opinion. Id. at 72-73 (Kennedy, J., dissenting).  More specifically, the majority opinion held that "the District Court did not attempt to sanction petitioner for breach of contract, but rather imposed sanctions for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation." Id. at 54.  The majority opinion expressed "no opinion as to whether the District Court would have had the inherent power to sanction Chambers for conduct relating to the underlying breach of contract."  Id. at 55 n.16. The four dissenting Justices, however, read the district court opinion as imposing sanctions for "petitioner's flagrant, bad-faith breach of

_____

[17]The Sixth Circuit interpreted Richardson v. Communication Workers, 530 F.2d 126 (8th Cir.) (Richardson), cert. denied 429 U.S. 824 (1976), as an effort by this court to expand the bad faith exception to include bad faith in the conduct giving rise to the underlying claim and rejected any such extension.  Shimman v. International Union of Operating Eng'rs, Local 18, 744 F.2d 1226, 1233 (6th Cir. 1984) (Shimman), cert. denied, 469 U.S. 1215 (1985). We believe the Sixth Circuit interpreted Richardson too broadly and agree with the analysis that court used in Shimman.

contract." Id. at 60 (Scalia, J., dissenting). In his dissent, Justice Kennedy, joined by Chief Justice Rehnquist and Justice Souter, concluded that the majority opinion's assertion that the district court did not impose sanctions for breach of contract "appears to disclaim that its holding reaches prelitigation conduct." Id. at 72 (Kennedy, J., dissenting). Justice Kennedy suggested that,

> [d]espite the Court's equivocation on the subject, it is impermissible to allow a District Court acting pursuant to its inherent authority to sanction such prelitigation primary conduct. A court's inherent authority extends only to remedy abuses of the judicial process.

Id. at 74 (Kennedy, J., dissenting) (citation omitted). Justice Scalia "emphatically agree[d] with Justice Kennedy" that the district court had no power to impose sanctions based upon bad faith breach of contract. Id. at 60 (Scalia, J., dissenting). Justice Scalia further recognized that the American rule,

> deeply rooted in our history and in congressional policy, prevents a court (without statutory authorization) from engaging in what might be termed substantive fee shifting, that is, fee shifting as part of the merits award. It does not in principle bar fee shifting as a sanction for procedural abuse.

Id. at 59 (Scalia, J., dissenting) (citations omitted).

We infer support for our holding today from the Chambers majority opinion, which stated that "the sanctions imposed applied only to sanctionable acts which occurred in connection with the proceedings in the trial court."[18] Id. at 55. This statement, combined with the explicit denial of the Supreme Court's

---

[18]One incidence of petitioner Chambers' bad faith conduct was his fraudulent transfer of assets, which, although it "took place before the suit was filed, it occurred after Chambers was given notice, pursuant to court rule, of the pending suit," and thus was considered part of the proceeding. Chambers v. NASCO, Inc., 501 U.S. 32, 55 n.17 (1991).

adjudication of the applicability of attorney fees for pre-litigation breach of contract, leads us to hold that the district court's inherent power to award attorney fees as a sanction for bad faith conduct does not extend to pre-litigation conduct.

In the present case, the bad faith conduct, or more specifically, the bad faith administration of the contract, was part of the underlying substantive claim.  In fact, Lamb originally pleaded a breach of contract claim based upon NPPD's contract administration, but subsequently dismissed it voluntarily.  Second Am. Compl., App. for Appellant at 12.  As developed during oral argument, Lamb's claim for reasonable and proper damages under the contract's termination clause is essentially a breach of contract claim, as NPPD did not pay what Lamb says it owed Lamb under the termination damages clause.  Lamb cannot circumvent the McLarty rule by voluntarily dismissing the original substantive claim, but using the conduct upon which that claim was based as a means to obtain attorney fees.

Thus, we hold that NPPD's bad faith administration of the contract was pre-litigation conduct upon which the underlying substantive termination clause claim is based.  Under McLarty, such conduct does not provide a basis upon which the court may use its inherent power to award attorney fees.  6 F.3d 545.  Because the bad faith exception is inapplicable to this case as a matter of law, we see no reason to review the district court's factual finding of bad faith administration of the contract.  Similarly, because the bad faith exception does not apply in this case, the bad faith issue should not have been submitted to the jury.  For these reasons, we vacate the district court's award of attorney fees.

### III. Conclusion

Accordingly, the District Court's judgment is affirmed in part and reversed in part and the case is remanded to the district court for a new trial on damages.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.