EIU GROUP, INC., Plaintiff,

v.

CITIBANK DELAWARE, INC. and
Kent Zeigler, Defendants.

Civil Action No. 00–12565–WGY.

United States District Court,
D. Massachusetts.

April 21, 2006.

Terri L. Pastori Peabody & Arnold
LLP, Boston, MA, for Plaintiffs.

Joseph H. Reinhardt, J.D., Atty. at Law,
Boston, MA, Allen N. David Peabody &

Arnold LLP, Boston, MA, Edwin A. McCabe, McCabe, Brown & Davis, Boston, MA, for Defendants.

### MEMORANDUM

YOUNG, District Judge.

In this session of the United States District Court, every effort is made to enhance the quality of juror decisionmaking. This Court—rejecting the now thoroughly discredited six-person jury model [1]—routinely empanels twelve jurors in every civil case. In every case, jurors are permitted to take notes,[2] ask written questions,[3] and inspect at will any exhibit received in evidence.[4] The Court delivers detailed instructions in plain English before counsels' openings,[5] before final argument,[6] and after.[7] During every morning break, refreshments are delivered to the spacious jury room—a room well-lit by the morning sun through large windows. Books and a wide array of magazines (other than news magazines) are available. The Court is daily called to order with the cry: "All rise for the jury."[8]

All of this is designed to inspire and empower the jury, involving it as an equal partner with the judge in reaching out for genuine justice.[9]

You know what? It works.

American jurors routinely rise above stereotypes to grapple with the most complex factual issues with intelligence, common sense, and the most scrupulous discernment. Sometimes, they seek substantial justice beyond the more narrow confines of the legal case as presented by lawyers and judge.[10]

This is such a case.

## I. INTRODUCTION

The Court draws the following facts from the evidence offered at trial and pres-

---

1. See Fed.R.Civ.P. 48; *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 89–90 (D.Mass.2005); *Ciulla v. Rigny*, 89 F.Supp.2d 97, 102 n. 6 (D.Mass.2000) (citing scholarly and judicial criticism).

2. See, e.g., *Ethos Techs. v. RealNetworks, Inc.*, No. 02–11324–WGY (D.Mass.), Trial Tr. vol. 1, 88–89, Mar. 13, 2006 [Doc. No. 319]; *see also* 3 William Blackstone, *Commentaries on the Laws of England* 373 (1769).

3. See, e.g., *Ethos Techs. v. RealNetworks, Inc.*, Trial Tr. vol. 1, 89–90.

4. See, e.g., *id.* at vol. 2, 128–29, Mar. 14, 2006 [Doc. No. 320].

5. See, e.g., *id.* at vol. 2, 101–11.

6. See, e.g., *id.* at vol. 19, 2679–711, Apr. 12, 2006 [Doc. No. 369].

7. See, e.g., *id.* at 2762–67.

8. See, e.g., *id.* at vol. 3, 217, Mar. 15, 2006 [Doc. No. 320].

9. There are the most profound constitutional implications for the separation of powers, see *Enwonwu v. Chertoff*, 376 F.Supp.2d 42, 78–85 (D.Mass.2005), and the moral authority of the judiciary, see William G. Young, *Vanishing Trials, Vanishing Juries, Vanishing Constitution*, Suffolk U.L.Rev. (forthcoming Fall 2006) [hereinafter Young, *Vanishing Trials*], behind these quotidian steps. See Akhil Reed Amar, *America's Constitution: A Biography* 233–42, 329–32 (2005) [hereinafter Amar, *Constitution* ]; 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1774, at 653–54 (1833).

10. See, e.g., *Ethos Techs. v. RealNetworks, Inc.*, No. 02–11324–WGY (D.Mass.), Jury Verdict, Apr. 14, 2006 [Doc. No. 363] (detailing exactly which prior art anticipated or made obvious the disputed patent, though the verdict form only asked whether the patent was anticipated or obvious); *Monteiro v. Rubin*, No. 97–10408–WGY (D.Mass.), Memorandum, Nov. 10, 1998 [Doc. No. 59] (referring matter to U.S. Attorney for investigation of possible perjury at the specific request of the jury, which was "quite simply appalled at the vicious racial and ethnic slurs repeatedly uttered by [a witness].").

ents them in the light most favorable to the jury verdict.

The defendant Citibank Delaware, Inc. ("Citibank") was an investor in EIU Group, Inc. ("EIUG"), which sought to develop and market environmental insurance policies. As part of Citibank's deal with EIUG, Citibank was entitled to have a representative on EIUG's board—defendant Kent Ziegler ("Ziegler"). While EIUG's insurance product was in development, Citibank and Ziegler learned of and invested in yet another environmental insurance company. Citibank and Ziegler decided that this second company had more promise than EIUG and worked to channel potential customers to this second company instead of EIUG. They also denied needed financing and worked to prevent EIUG from finding a suitable reinsurer in order to starve EIUG out of existence. Citibank and Zeigler succeeded in this attempt, causing EIUG and its other investors losses totaling, it was claimed, millions of dollars.

EIUG brought suit for breach of fiduciary duty against Citibank and Ziegler for having worked against the interests of EIUG while at the same time serving on its board. After a six-day trial and two days of deliberation, see Electronic Clerk's Notes 11/28/05–12/02/05 & 12/05/05–12/06/05, the jury returned a verdict in the amount of $654,585 against Citibank and Ziegler.[11] After finding the amount of monetary damages, the jury went on to award: "plus 100% legal fees incurred by

EIUG regarding this litigation".[12] Jury Verdict [Doc. No. 177] at 1.

On January 4, 2006 the Court entered judgment in favor of EIUG in the amount of only $654,585 (plus interest)—i.e., not including "100% legal fees". *See* Order of 01/04/06 [Doc. No. 180]. In response, EIUG filed a motion pursuant to Federal Rule of Civil Procedure 59(e) requesting that the Court alter its judgment and include attorneys' fees as instructed by the jury. Motion to Alter or Amend Judgment [Doc. No. 185] ("EIUG's Mot."). After oral argument on March 2, 2006, the Court denied EIUG's motion. *See* Electronic Clerk's Notes 03/02/06. This memorandum analyzes this most unique issue and explains the Court's decision.

## II. DISCUSSION

### A. The "American Rule"

"For generations of American lawyers it has been boldfaced black letter law that … a litigant must, with few exceptions, bear the single greatest cost of asserting his legal rights—his attorney's fees—regardless of the outcome of his action." Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts*, 122 U. Pa. L.Rev. 636, 637 (1974) [hereinafter *Court Awarded Fees* ]. This "American Rule" is in contrast to the "British Rule"—loser pays—which has been employed in England since the Statute of Gloucester in 1278.[13] David A. Root, *Attorney Fee-*

---

**11.** The jury also found in favor of EIUG on a counterclaim regarding a promissory note. Jury Verdict at 2.

**12.** Although no party sought any Court action at this juncture, i.e. prior to the discharge of the jury, it crossed my mind to recommit the case to the jury with an instruction that I had no power to award such attorneys' fees. I did not do so because (1) as the following discussion illumines, I was unsure of the point and

didn't want to shoot from the hip, and (2) such a recommittal would have been tantamount to an improper charge to bring in a higher verdict.

**13.** Note that the British Rule came about by statute; courts at common law did not have the power to award attorneys' fees. See *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44

*Shifting in America: Comparing, Contrasting, and Combining the "American Rule" and "English Rule"*, 15 Ind. Int'l & Comp. L.Rev. 583, 590 (2005).

How the contrary American Rule came into existence is a matter of some opacity. The weight of the evidence suggests, however, that the British Rule prevailed in early American history. *See Court Awarded Fees, supra*, at 640 ("Curiously enough, it appears that early courts in colonial America routinely awarded all costs, including the fees of counsel, to the successful litigant."); W. Kent Davis, *The International View of Attorney Fees in Civil Suits: Why is the United States the "Odd Man Out" in How it Pays its Lawyers?*, 16 Ariz. J. Int'l & Compl. L. 361, 400 (1999) ("In general, the rule adopted by the colonies did not deviate from the entrenched English fee shifting rule. On both sides of the Atlantic, statutes provided the basis for attorney fee shifting."); Jane P. Mallor, *Punitive Attorneys' Fees for Abuses of the Judicial System*, 61 N.C. L.Rev. 613, 615 (1983) ("There is some evidence that the English practice was retained for a short while in early America."); Root, *supra*, at 584 ("Originally, the United States adopted the 'loser pays' rule from England and awarded attorneys fees to the successful party."). *But see Tenth Circuit Survey: Attorneys' Fees*, 75 Denv. U.L.Rev. 711, 712 (1998) [hereinafter *Attorneys' Fees*] ("The early American colonies rejected the English Rule.").

Whatever the practices in the colonies and (later) states, the general statutory rule in federal courts since the Federal Judiciary Act of 1789 has been to follow state law. *See Alyeska*, 421 U.S. at 247–57 & n. 19, 95 S.Ct. 1612. As early as 1796, the American Rule must have been entrenched enough for the Supreme Court to declare "that the Judiciary itself would not create a general rule, independent of any statute, allowing awards of attorneys' fees in federal courts." *Id.* at 249, 95 S.Ct. 1612 (citing *Arcambel v. Wiseman*, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796)). The Court in *Arcambel* concluded that "[t]he general practice in the United States is in op[p]osition to it; and even if that practice were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute." 3 U.S. (3 Dall.) at 306. "This Court has consistently adhered to that early holding." *Alyeska*, 421 U.S. at 250, 95 S.Ct. 1612 (citing *Day v. Woodworth*, 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851); *Oelrichs v. Spain*, 82 U.S. (15 Wall.) 211, 21 L.Ed. 43 (1872); *Flanders v. Tweed*, 82 U.S. (15 Wall.) 450, 21 L.Ed. 203 (1873); *Stewart v. Sonneborn*, 98 U.S. 187, 25 L.Ed. 116 (1879); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

Justification for the American Rule was slow in coming—which may be understandable for a rule that the Supreme Court admitted may not be "strictly correct in principle". Certainly, early Americans' rejection of all things English played a role.[14] *Attorneys' Fees, supra*, at 712; *Court Awarded Fees, supra*, at 641. Americans' "fierce frontier individualism"—"[t]he popular view of the solitary

---

L.Ed.2d 141 (1975); *Court Awarded Fees* at 640.

14. Courts in New Hampshire enacted a rule prohibiting even citation to English courts. See *Court Awarded Fees* at 641.

folk-hero fighting for his rights"—is also hypothesized to have been "extraordinarily influential". *Court Awarded Fees, supra,* at 641 (citing R. Pound, *The Spirit of the Common Law* 145 (1921)). Moreover, "[c]olonists believed the law was straightforward, and therefore, they considered lawyers unnecessary." *Attorneys' Fees, supra,* at 713; *see also* Mallor, *supra,* at 616 ("The law was not perceived as a complex or scientific body of knowledge, but rather as a matter of common sense and equitable principles, so that acting as an attorney was not thought to entitle one to compensation.").

This legal reflection of American individualism must surely have also been derivative of early Americans' distrust of—even hatred for—lawyers. Even in England the use of fee statutes reflected "more the legislature's goal of limiting the amount a lawyer could charge his client rather than awarding the costs to the prevailing party." Root, *supra,* at 584. In the Massachusetts Bay Colony, "the *Body of Liberties* (1641) prohibited pleading for hire." Lawrence M. Friedman, *History of American Law* 94 (2d ed.1985). In the Carolinas, the Fundamental Constitutions labeled it "a base and vile thing to plead for money or reward." *Id.* Consequently, no lawyers practiced in South Carolina until 1699. *Id.* In many colonies, attorneys were forbidden from charging any fee at all. *Attorneys' Fees, supra,* at 713; *Court Awarded Fees, supra,* at 641. Some colonies followed English practice, though, and established fee schedules for lawyers' pay. Mallor, *supra,* at 615. Additionally, lawyers were viewed as members of the upper class and thus reviled by lower classes. Friedman, *supra,* at 95; *Court Awarded Fees, supra,* at 640–41. Add to this the fact that lawyers traditionally were officers of the courts of the King of England, and one can further understand the source of lawyers' low standing in Revolutionary America. *See also* Amar, *Constitution, supra,* at 207 (explaining that in ten of the thirteen colonies the sitting chief justice or his equivalent did not side with the colonists in their fight for independence).

Some commentators have suggested that the American Rule was the unintended result of the wane of the anti-lawyer fee statutes. Under many early American systems, attorneys' fees were strictly controlled via fee schedules. See *supra.* These schedules, however, "were not updated to reflect the changing value of money...." Mallor, *supra,* at 615. When statutes had provided for both attorneys' fees and costs, "costs" had been interpreted not to include attorneys' fees, but rather court-associated fees only. Whether by reason of burdensome administration or pressure from a bar wanting to earn a decent living, the attorneys' fees statutes were repealed or allowed to lapse, leaving only statutes for "costs", so interpreted, in place. Davis, *supra,* at 400. An 1853 statute—still in effect at Title 28, Sections 1920 and 1923(a) of the United States Code—is the federal result of this "compromise". See *Alyeska,* 421 U.S. at 251–57, 95 S.Ct. 1612; Davis, *supra,* at 400. Thus, the American Rule has been described to be the result of an "historical accident", Albert A. Ehrenzweig, *Reimbursement of Counsel Fees and the Great Society,* 54 Cal. L.Rev. 792 (1966), and a "judicial preoccupation with stare decisis", *Court Awarded Fees, supra,* at 642.

This hypothesizing aside, in *Arcambel* (where the Supreme Court first adopted the American Rule), the Court gave no reasoning for it. *See* 3 U.S. (3 Dall.) 306, 1 L.Ed. 613. Nor in 1851 did the Court take the opportunity in *Day* to expound on its rationale. See 54 U.S. (13 How.) at 371–73. But "[b]y 1872 ... the Court seems to have felt compelled to justify maintaining the American Rule." *Court Awarded Fees,*

*supra*, at 642. The laundry list of offered reasons manifested concerns of fairness and judicial administration:

> The parties ... are upon a footing of equality. There is no fixed standard by which the honorarium can be measured. Some counsel demand much more than others. Some clients are willing to pay more than others. More counsel may be employed than are necessary. When both client and counsel know that the fees are to be paid by the other party there is danger of abuse. A reference to a master, or an issue to a jury, might be necessary to ascertain the proper amount, and this grafted litigation might possibly be more animated and protracted than that in the original cause.

*Oelrichs*, 82 U.S. (15 Wall.) at 231. In the Court's next opinion on the subject, it propounded "a novel defense of the American Rule", *Court Awarded Fees, supra*, at 643, that "[t]he fees of counsel in prosecuting this case were no part of the consequences naturally resulting from the action of the defendants in suing out the decree and warrant in bankruptcy," *Stewart*, 98 U.S. at 197. In other words, attorneys' fees are not the proximate result of a defendant's actions. *See Court Awarded Fees, supra*, at 643. The modern Court has offered the additional justifications that, "since litigation is at best uncertain[,] one should not be penalized for merely defending or pros-

ecuting a lawsuit" and that "the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann*, 386 U.S. at 718, 87 S.Ct. 1404. The Court has also reiterated its concern that "the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration." *Id.*[15]

## B. Exceptions: Inherent Power and Bad Faith

As with any strict rule, exceptions have developed.[16] Foremost among these are statutory. Using the power acknowledged by the Supreme Court at least since *Arcambel*, Congress has authorized a large variety of circumstances and types of cases where courts must or may impose attorneys' fees. *See, e.g., Alyeska*, 421 U.S. at 260 n. 33, 95 S.Ct. 1612 (citing various statutes)[17]; *Chambers*, 501 U.S. at 42 n. 8, 111 S.Ct. 2123 (citing various Federal Rules of Civil Procedure); *Court Awarded Fees, supra*, at 646–47. As another exception, courts also give effect to parties' contractual terms providing for the winner of any suit to be awarded attorneys' fees. *Root, supra*, at 585–86.

Beyond these express authorizations, however, the Supreme Court has recognized exceptions which derive from a

---

**15.** *See also Mallor, supra*, at 617–19; *Attorneys' Fees, supra*, at 715. For criticism of the American Rule, see Davis, *supra*; Ephraim Fischbach & William McLauchlan, *Reverse-Cost-Shifting: A New Proposal for Allocating Legal Expenses*, 32 J. Marshall L.Rev. 35 (1998); John J. Donohue III, *Opting for the British Rule, or If Posner and Shavell Can't Remember the Coase Theorem, Who Will?*, 104 Harv. L.Rev. 1093 (1991); *see also F.D. Rich Co.*, 417 U.S. at 129 n. 15, 94 S.Ct. 2157 (citing articles).

**16.** Justice Scalia has suggested that this is in an effort to preserve the rule itself. *See Chambers*, 501 U.S. at 59, 111 S.Ct. 2123 (Scalia, J., dissenting). Others suggest—not necessarily in contradiction—that the exceptions are a result of the rule's own weakness. *Attorneys' Fees, supra*, at 716.

**17.** Most U.S. attorneys' fees statutes do not provide for the British Rule of "loser pays". Rather, they employ a one-way fee-shifting scheme whereby only the plaintiff is awarded attorneys' fees upon winning. *Root, supra*, at 588.

court's inherent power. In *United States v. Hudson*, the Court stated that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution.... To fine for contempt—imprison for contumacy—[e]nforce the observance of order, & c. are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others...." 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812).[18] The modern Court has likewise endorsed the principle. *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ("[Inherent powers are] governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."); *see also Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 560–65 (3d Cir.1985). Inherent powers, however, "because of their very potency", *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123, and because they "are shielded from direct democratic controls", must be employed with "restraint and discretion", *Roadway Express*, 447 U.S. at 764, 100 S.Ct. 2455.

One aspect of a court's inherent power relates to attorneys' fees, see *Sprague v. Ticonic*, 307 U.S. 161, 164–66, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), and the Supreme Court has recognized three exceptions to the American Rule under such power.[19] The first and most obvious is deduced from the Supreme Court's statement in *Hudson:* the enforcement of contempt orders. *See, e.g., Toledo Scale Co. v. Computing Scale Co.*, 261 U.S. 399, 426–28, 43 S.Ct. 458, 67 L.Ed. 719 (1923); *Fleischmann*, 386 U.S. at 718, 87 S.Ct. 1404; Daniel H. Fehderau, Comment, *Rule 11 and the Court's Inherent Power to Shift Attorney's Fees: An Analysis of Their Competing Objectives and Applications*, 33 Santa Clara L.Rev. 701, 704–05 (1993); Root, *supra*, at 587. The second exception is called the "common fund" exception. It is employed when the benefit of a successful suit accrues not only to the litigant, but also to others, and the fund from which the damages award is being drawn is likewise for the benefit of those others or if the fund itself was protected by the litigation. *See, e.g., Trustees v. Greenough*, 105 U.S. 527, 532–38, 26 L.Ed. 1157 (1881); Fehderau, *supra*, at 704; Root, *supra*, at 586–87. Finally, courts can employ a third exception—the "bad-faith" exception—to award attorneys' fees "to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons". *F.D. Rich Co.*, 417 U.S. at 129, 94 S.Ct. 2157; *see also Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). An award of attorneys' fees under the bad-faith exception is punitive[20] and "certainly should not be assessed lightly or without fair notice and

---

18. For criticism of the concept of inherent power generally, see Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 Iowa L.Rev. 735 (2001). For criticism in the area of bad-faith fee-shifting, see Stephen K. Christiansen, *Inherent Sanctioning Power in the Federal Courts after Chambers v. NASCO, Inc.*, 1992 B.Y.U. L.Rev. 1209 (1992).

19. Some support can be found that this power derives not from a court's "inherent" power, but rather from its "equitable" power.

See *Guardian Trust Co. v. Kansas City S. Ry. Co.*, 28 F.2d 233, 240–46 (8th Cir.1928); *see also Sprague*, 307 U.S. at 164–65, 59 S.Ct. 777. There appears to be no practical difference from whence these powers came, however, given that Congress has not legislated so as to deprive courts of them. *See Chambers*, 501 U.S. at 42–51, 111 S.Ct. 2123.

20. *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Mallor, supra*, at 630; *Court Awarded Fees, supra*, at 690.

an opportunity for a hearing on the record." *Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455; *see also Cordeco Dev. Corp. v. Vasquez*, 539 F.2d 256, 263 (1st Cir.1976) ("Whatever the parameters of the 'bad faith' exception, fees should be awarded under its authority only in extraordinary circumstances and for dominating reasons of justice.").

In 1975, the Supreme Court in *Alyeska* froze the scope of courts' inherent powers to award attorneys' fees at these three previously recognized exceptions. Though citing all three exceptions approvingly, *see Alyeska*, 421 U.S. at 257–60, 95 S.Ct. 1612, the Court stated that Congress has not "extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Id.* at 260, 95 S.Ct. 1612. It then went on to reject a "private attorney general" exception that had been recognized by several Circuit Courts of Appeals. *Id.* at 246, 269, 95 S.Ct. 1612. Thus, it is under the third exception—for "bad-faith"—that EIUG would here be awarded attorneys' fees, if at all.[21]

What behavior constitutes actionable, fee-shifting bad faith is an issue on which there is little guidance. Very few Supreme Court decisions have actually turned on the question; most relevant comments have been in dicta.[22] Consequently, lower courts have had "little more to work with than a worn-out phrase, passed from case to case, with no substance: fees can be shifted when a party has acted 'in bad faith, vexatiously, wan-

tonly, or for oppressive reasons.'" Christiansen, *supra*, at 1225. Does the exception apply only to *litigation* bad faith? Or to *pre*-litigation bad faith as well? All pre-litigation bad faith? Even bad faith giving rise to the underlying action? Or just bad faith in bringing or necessitating the lawsuit?

Only two Supreme Court cases have awarded attorneys' fees to the winning party under the bad-faith exception: *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), and *Chambers v. NASCO, Inc.* In *Vaughan*, a seaman contracted tuberculosis during a voyage and incurred medical expenses once arriving at port. 369 U.S. at 528, 82 S.Ct. 997. The provision of "maintenance and cure" for seamen by the vessel's owners is customary in admiralty law if an ailment is contracted during service to the vessel. *Id.* When the seaman presented his bills to the owner, the owner "made no effort to make any further investigation of [the seaman's] claim . . ., and . . . did not bother even to admit or deny the validity." *Id.* at 528–29, 82 S.Ct. 997. As a result, the seaman "was required to hire an attorney and sue in the courts to recover maintenance and cure, agreeing to pay the lawyer a 50% contingent fee." *Id.* at 529, 82 S.Ct. 997. The Court awarded the seaman his attorneys' fees as part of the damages calculation. *Id.* at 530–31, 82 S.Ct. 997. The reason:

> [The owners] were *callous in their attitude* . . . . As a result of [the owners']

---

**21.** EIUG would also be able to receive attorneys' fees if Massachusetts law so provided. See *Chambers*, 501 U.S. at 51–55, 111 S.Ct. 2123; *Alyeska*, 421 U.S. at 259 n. 31, 95 S.Ct. 1612; *Attorneys' Fees, supra*, at 726–27. EIUG does not argue under Massachusetts law; therefore, this Memorandum addresses only the "bad faith" argument.

**22.** See *Hall*, 412 U.S. at 15, 93 S.Ct. 1943 (stating in a case involving the common fund exception that "[i]t is clear . . . that 'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation."); *Roadway Express*, 447 U.S. at 765–67, 100 S.Ct. 2455 (1980) (quoting *Hall* and remanding for a finding on the issue of bad faith).

recalcitrance, [the seaman] was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was *willful and persistent.*

*Vaughan,* 369 U.S. at 530–31, 82 S.Ct. 997 (emphasis added). Thus, the bad-faith actions giving rise to this award were clearly pre-litigation occurrences. How far can this principle be stretched?

In *Chambers,* the Court implied the answer: not far. The defendant, Chambers, had signed a contract to sell his television station and broadcast license to the plaintiff, NASCO. *Chambers,* 501 U.S. at 35–36, 111 S.Ct. 2123. Wanting to renege on the contract, Chambers failed to file the necessary paperwork with the FCC in order to effectuate the deal. *Id.* at 36, 111 S.Ct. 2123. NASCO threatened legal action, but before it could file, Chambers (with help from his attorney) "acted to place the properties at issue beyond the reach of the District Court by means of" a trust, taking advantage of technical recording provisions of state law. *Id.* at 36–37, 111 S.Ct. 2123. The obfuscation was not yet complete, however, before NASCO was able to hale Chambers into court seeking a temporary restraining order. *Id.* at 37, 111 S.Ct. 2123. Chambers's attorney did not inform the court of the charades underway despite the court's direct inquiries regarding the planned disposition of the assets. *Id.* The court issued the TRO, but Chambers nevertheless effectuated the transfer to the trust. *Id.* In addition to this outrageous behavior, Chambers engaged in countless discovery abuses throughout the litigation, including refusing to allow NASCO to inspect the station's business records. *Chambers,* 501 U.S. at 38, 111 S.Ct. 2123. He also employed "a series of meritless motions and pleadings and delaying actions." *Id.* (internal quotation marks omitted). Finally, on the eve of trial, Chambers came clean and admitted the validity of the original contract, and the court entered judgment against him. *Id.* at 38–39, 111 S.Ct. 2123. Before judgment could be enforced, however, Chambers removed all of the equipment from the station in an attempt to prevent its sale. *Id.* at 39, 111 S.Ct. 2123.

Determining that neither Federal Rule of Civil Procedure 11 nor Title 28, Section 1927 of the United States Code provided the needed remedial tools, the district court invoked its inherent power to award nearly one million dollars in attorneys' fees to NASCO. *Id.* at 40, 111 S.Ct. 2123. This amount "represented the *entire* amount of NASCO's litigation costs paid to its attorneys." *Id.* (emphasis added). The court stated that the

> sanctionable conduct was that Chambers ... had (1) attempted to deprive [the] Court of jurisdiction by acts of fraud, nearly all of which were performed outside the confines of [the] Court, (2) filed false and frivolous pleadings, and (3) attempted, by other tactics of delay, oppression, harassment and massive expense to reduce [NASCO] to exhausted compliance.

*Chambers,* 501 U.S. at 41, 111 S.Ct. 2123 (internal quotation marks omitted). In a five-to-four vote, the Supreme Court affirmed the award. *Id.* at 58, 111 S.Ct. 2123.

The dissenting opinions faulted the majority for its encroachment on the American Rule. The rule "deeply rooted in our history and congressional policy" was that "fee shifting as a sanction can only be imposed for *litigation* conduct characterized by bad faith." *Id.* (Scalia, J., dissenting). Justice Kennedy thought that the Court's affirmation of a district court ruling that "sanctioned [Chambers] at least in part for his so-called bad-faith breach of contract ... subvert[ed] the American

Rule and turn[ed] the *Erie* doctrine upside down...." *Id.* at 61, 111 S.Ct. 2123 (Kennedy, J., dissenting). "That rule," Justice Scalia wrote, "prevents a court (without statutory authorization) from engaging in what might be termed *substantive* fee shifting, that is, fee shifting as part of the merits award." *Id.* at 59, 111 S.Ct. 2123 (Scalia, J., dissenting). Justice Kennedy viewed the decision as "allow[ing] a District Court acting pursuant to its inherent authority to sanction ... prelitigation primary conduct." *Id.* at 74, 111 S.Ct. 2123 (Kennedy, J., dissenting). By affirming the district court's "candid and extensive opinion[, which] reveal[ed] that the bad faith for which [Chambers] was sanctioned extended beyond the litigation tactics and comprised as well what the District Court considered to be bad faith in refusing to perform the underlying contract three weeks before the lawsuit began", the decision went "well beyond the exception to the American Rule and violate[d] the Rule's careful balance between open access to the federal court system and penalties for the willful abuse of it." *Id.* at 73, 74, 111 S.Ct. 2123 (Kennedy, J., dissenting).

The majority opinion repeatedly disclaimed the dissenters' view of the decision—which Justice Kennedy did recognize, but did not accept. *Id.* at 72, 111 S.Ct. 2123 (Kennedy, J., dissenting). The Court regularly intoned that the acts "[o]f particular relevance here" were those that related to that aspect of inherent power which allowed a court to act on "proof that a fraud ha[d] been perpetrated upon [it]." *Id.* at 44, 111 S.Ct. 2123. A court's inherent power "to punish for contempts" was also at play. *Id.* (internal quotation marks omitted). The majority opinion repeatedly quoted authorities approving of court power to award attorneys' fees in such instances. The Court stressed that sanctions were appropriate because they "were imposed for conduct *during* the litigation."

*Id.* at 54, 111 S.Ct. 2123 (emphasis added). Contrary to the dissents' characterization, "the District Court *did not* attempt to sanction [Chambers] for breach of contract, but rather imposed sanctions for the fraud he perpetrated on the court and the bad faith he displayed toward both his adversary and the court throughout the course of the litigation." *Id.* (emphasis added).

With four justices dissenting in disapproval of awarding attorneys' fees for perceived pre-litigation, bad-faith conduct and five justices categorically denying that the Court's opinion so held, it would seem that there was not a single justice approving of an award of attorneys' fees in such circumstances. One might wonder, though, why the dissenting opinions concluded as they did, given the words of the majority opinion. The first answer can be deduced from what the Court actually *did:* It approved the district court's award to NASCO of the *entire* amount of its attorneys' fees. *Id.* at 35, 40, 111 S.Ct. 2123. This must have included pre-litigation expenses—NASCO did have to prepare to file its suit, after all—which accrued *necessarily* before Chambers could have done anything approaching the contemptuous. Most importantly, however, and despite all of the language suggesting the contrary, the Court *expressly reserved the question* of whether "the District Court would have had the inherent power to sanction Chambers for conduct relating to the underlying breach of contract...." *Id.* at 54 n. 16, 111 S.Ct. 2123. Given this, the dissents seem correct in their characterization of the majority opinion as "equivoca[l]" on the issue. *Id.* at 74, 111 S.Ct. 2123 (Kennedy, J., dissenting); *see also S.D. Schuler, Chambers v. NASCO, Inc.: Moving Beyond Rule 11 Into the Uncharted Territory of Courts' Inherent Power to Sanction,* 66 Tul. L.Rev. 591, 602 (1991) ("The primary

effect of *[Chambers]* will be to drive both lawyers and parties further into the dark with respect to exactly what conduct is sanctionable.").

Regardless of the intended meaning of the Supreme Court's comments on the issue in *Chambers,* lower courts that squarely have addressed it (i.e., not in dicta) uniformly have limited the bad-faith exception to litigation behavior.[23] As the Ninth Circuit has stated,

> [N]o federal appellate authority in or out of the Ninth Circuit has clearly approved an order shifting attorney's fees based solely upon a finding of bad faith as an element of the cause of action presented in the underlying suit. We decline to do so. Expansively applied, the bad faith exception risks conflict with the rationale of the American rule and hence should be construed narrowly.... Moreover, expanding the exception to encompass cases in which the only bad faith alleged is an element of the cause of action would appear to justify an award in every fraud case.

*Association of Flight Attendants, AFL–CIO v. Horizon Air Indus. Inc.,* 976 F.2d 541, 550 (9th Cir.1992) (citing *Mallor, supra,* at 634); *see also Lamb Eng'g & Constr. Co. v. Nebraska Pub. Power Dist.,* 103 F.3d 1422, 1433–37 (8th Cir.1997); *Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1503 (5th Cir.1995) ("[T]he bad-faith exception to the American rule ... is not a punitive award in the 'tort' sense of punishing the underlying conduct that gives rise to a plaintiff's claim. Tort-like punitive damages are awarded on the basis of the merits of a case, while bad-faith fee-shifting punishes abuses of the litigation process."); *Sanchez v. Rowe,* 870 F.2d 291, 293–95 (5th Cir.1989) ("Extending the bad-faith exception to include bad faith in the acts giving rise to the substantive claim is inconsistent with the rationale behind the American Rule."); *Woods v. Barnett Bank,* 765 F.2d 1004, 1014 (11th Cir.1985) ("The bad faith or vexatious conduct must be part of the litigation process itself."); *Shimman v. Int'l Union of Operating Eng'rs,* 744 F.2d 1226, 1228–34 (6th Cir. 1984) ("A person who harms another in bad faith is nonetheless entitled to defend a lawsuit in good faith.... We therefore hold that the bad faith exception to the American Rule does not allow an award of attorney's fees based only on bad faith in the conduct giving rise to the underlying claim."); *Mallor, supra,* at 632–38; Jay E. Rosenblum, *The Appropriate Standard of Review for a Finding of Bad Faith,* 60 Geo. Wash. L.Rev. 1546, 1550–54 (1992).

The First Circuit has not directly addressed this issue. This Court does have the benefit of pre-*Chambers* dicta, however, which places the First Circuit in line with the circuits cited above. The court in 1976 recognized the potential conflict between a broad interpretation of the bad-faith exception, encompassing pre-litigation behavior, and the "traditional concept which authorized an award of fees for bad faith in bringing suit or in the course of litigation." *Cordeco,* 539 F.2d at 262–63. The court "quesiton[ed] whether the imposition of fee awards for wrongful conduct in the events leading to suit can be reconciled with the rationale of *Alyeska* ...." *Id.* at 263.

It is uncertain whether the First Circuit would go even as far as the broadest main-

---

**23.** This conclusion is in line with dicta in previous Supreme Court decisions as well. *See, e.g., F.D. Rich Co.,* 417 U.S. at 130–31, 94 S.Ct. 2157 ("[W]e are being asked to go the last mile in this case, to judicially obviate the American Rule in the context of everyday commercial litigation, where the policies which underlie the limited judicially created departures from the rule are inapplicable. This we are unprepared to do.").

stream interpretation of the bad-faith exception: bad faith in bringing or defending a lawsuit. *See id.* at 262, 95 S.Ct. 1612. Some courts have allowed an award of attorneys' fees if it was so obvious that a party owes another and yet does not settle the dispute and forces the other party to bring suit. The owing party then may be said to have defended the suit in bad faith. Conversely, if a party brings suit against another, against whom the party knows he has no valid claim, the party may be said to have brought suit in bad faith. The Supreme Court's decision in *Vaughan* fits into this category. *See* 369 U.S. at 531, 82 S.Ct. 997 ("As a result of [the owners'] recalcitrance, [the seaman] was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old."). Likewise, many Circuit courts have recognized the exception as being so broad. *American Hosp. Ass'n v. Sullivan,* 938 F.2d 216, 219–20 (D.C.Cir. 1991) ("Bad faith in conduct giving rise to the lawsuit may be found where a party, confronted with a clear statutory or judicially imposed duty towards another, is so recalcitrant in performing that duty that the injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights." (internal quotation marks omitted)); *Sanchez,* 870 F.2d at 295 ("[T]he requisite bad faith may be found in a party's conduct *in response* to a substantive claim, whether it be before or after an action is filed...."); *Woods,* 765 F.2d at 1014 ("Deviation from the 'American Rule' may be appropriate if [a suit is] brought or maintained for oppressive reasons...."); *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980) ("[T]here must be clear evidence that the claims are entirely without color and made for reasons of harassment or delay or for other improper purposes." (internal quotation marks omitted)); see *Galveston County Navigation Dist. No. 1 v. Hopson Towing Co.,* 92 F.3d 353, 359–60 (5th Cir.1996); *see also Mallor, supra,* at 632–44.[24] (It is unclear how a court practically is to balance these principles against a party's acknowledged right to defend or bring a lawsuit. *See Fleischmann,* 386 U.S. at 718, 87 S.Ct. 1404; *Shimman,* 744 F.2d at 1232.) This application of the bad-faith exception, however, is the broadest that any modern court has allowed and is most often employed against governmental institutions that continue to infringe on citizens' constitutional rights despite repeated rulings in similar cases that such infringement is unacceptable (e.g., school desegregation cases). *Mallor, supra,* at 633–34.

There is one nagging question: What did the Supreme Court mean in *Hall* when it stated that "[i]t is clear, however, that 'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation"? 412 U.S. at 15, 93 S.Ct. 1943. The Court gave further life to this language by quoting it in *Roadway Express* when remanding the case to the district court for a finding on bad faith. 447 U.S. at 766, 100 S.Ct. 2455. EIUG rests its entire argument on the supposed powers granted this court in *Hall.* See EIUG's Mot. at 4 ("In short, the jury ... reasoned its way to ... *Hall.*"). The Sixth Circuit in *Shimman* persuasively (and correctly) answered the apparent mystery:

---

**24.** Some courts have even suggested that bad-faith, pre-litigation conduct regarding the underlying claim may be *considered* in awarding attorneys' fees if there is also bad faith demonstrated during the course of litigation. *See, e.g., Lamb Eng'g,* 103 F.3d at 1435; *Perales v. Casillas,* 950 F.2d 1066, 1071 (5th Cir.1992); *see also Horizon Air,* 976 F.2d at 549 ("At most, the cases may suggest prelitigation conduct *might be relevant* to an award of fees for bad faith conduct during the litigation." (emphasis added)).

*Hall v. Cole* ... should not be read as expanding the bad faith exception to the American Rule.

The Court in *Hall* was not presented with the question of whether the bad faith exception applied to bad faith in the acts giving rise to the underlying claim. The question before the Court in *Hall* was whether the "common fund" exception could be extended to a case where there was no common fund but a common benefit of injunctive relief. There was no finding in *Hall* that the defendants had acted in bad faith.

More importantly, the statement in *Hall* ... should not be read as referring to the bad faith exception at all. It is critical to understand the context in which the statement on bad faith was made.... Defendants were arguing that since the common benefit theory is an equitable doctrine, the district court had abused its discretion in awarding such fees where it had found that defendants acted in good faith in expelling plaintiff and plaintiff had acted in bad faith. Answering those arguments the Court said:

> Petitioners also contend that the award of attorneys' fees in this case was improper because the District Court, in denying respondent's claim for punitive damages, found that "the defendants, in good faith, believed that they had a right to charge and discipline [respondent] for his actions." It *is clear, however, that "bad faith" may be found, not only in the actions that led to the lawsuit, but* *also in the conduct of the litigation.* And, as the Court of Appeals noted, the conduct of this particular litigation was marked by "the dilatory action of the union and its officers...." Moreover, although the presence of "bad faith" is essential to "fee-shifting" under a "punishment" rationale, neither the presence nor absence of "bad faith" is in any sense dispositive where attorneys' fees are awarded to the successful plaintiff under the "common benefit" rationale recognized in *Mills* and operative today.

The Court's discussion of bad faith was entirely within the context of determining whether the relative equities of the parties' positions precluded application of the equitable common benefit doctrine.

744 F.2d at 1232–33 (fourth and fifth alterations in original, citations omitted, emphasis added). Thus, EIUG's reliance on *Hall* is misplaced, and the law does not much support EIUG's position.

## C. But Consider ...

Despite the foregoing analysis of the law on this topic, given this Court's great regard for the American jury,[25] the Court would be inclined to honor the jury verdict in this case if it were possible honestly to do so within the controlling law. To start, it should be recognized that no court superior to this one has ever *held* that bad faith in the commission of the acts giving rise to a lawsuit may not also constitute the bad

---

**25.** *See DeLaventura v. Columbia Acorn Trust,* 417 F.Supp.2d 147 (D.Mass.2006); *In re Relafen Antitrust Litigation,* 231 F.R.D. 52 (D.Mass.2005); *Enwonwu v. Chertoff,* 376 F.Supp.2d 42, 78–85 (D.Mass.2005); *Miara v. First Allmerica Fin. Life Ins. Co.,* 379 F.Supp.2d 20, 69 n. 57 (D.Mass.2005); *United States v. Green,* 346 F.Supp.2d 259 (D.Mass. 2004); *Berthoff v. United States,* 140 F.Supp.2d 50, 61–95 (D.Mass.2001); *Ciulla v.* *Rigny,* 89 F.Supp.2d 97, 102 n. 7 (D.Mass. 2000); *Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 271 n. 3 (D.Mass.1998); *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 63 n. 74 (D.Mass.1997); *In re Acushnet River & New Bedford Harbor,* 712 F.Supp. 994 (D.Mass. 1989); William G. Young, "An Open Letter to U.S. District Judges", Fed. Law., July 2003, at 30–35; Young, *Vanishing Trials, supra.*

faith required to award fees under the exception. Indeed, given the opportunity—and over strong dissent on the point—the Supreme Court in *Chambers* explicitly reserved the issue. 501 U.S. at 54 n. 16, 111 S.Ct. 2123. Moreover, the ruling of the Supreme Court affirmed a district court award of one-hundred percent attorneys' fees. *Id.* at 35, 40, 111 S.Ct. 2123. It is simply not possible that the entirety of a plaintiff's attorneys' fees is the result of a defendant's bad faith only during the course of litigation. Further, even though several Circuit Courts of Appeals have rejected the notion of awarding attorneys' fees for pre-litigation, bad-faith conduct, the First Circuit has not yet done so explicitly. *Cordeco,* 539 F.2d at 262–63. At least two of the courts that have considered the question—including the one which gave the issue the most thorough examination (the Sixth Circuit in *Shimman* )—reached their conclusions prior to the Supreme Court's arguably equivocal decision in *Chambers.* This Court, therefore, is free to consider the strength of the argument in favor of awarding attorneys' fees in this case—though with a respectful eye to strongly persuasive dicta and holdings arguing otherwise.

Such an award would not be unprecedented. In *Richardson v. Communications Workers of America, AFL–CIO,* a jury found the defendant union liable for contributing to the wrongful discharge of the plaintiff. 530 F.2d 126, 128–29 (8th Cir.1976). The court, as part of its order of judgment, included attorneys' fees. *Id.* at 129. The Eighth Circuit affirmed the award "despite the fact that the claim for attorney fees was neither pled nor fully proven at the trial." *Id.* at 132 (citing

*Sprague,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184). The court ruled that "it [was] clear from the manner in which the damages were apportioned [26] that the jury regarded the unions' breach as aggravated. The Court agree[d], to the extent that in the absence of mitigating circumstances[,] the intentional failure of a labor union to discharge its fiduciary duty represents bad faith and establishes the plaintiff's right to recover his reasonable counsel fees." *Id.* Despite the Eighth Circuit's attempt twenty years later to distinguish the case as one in which. the relevant breach was "akin to litigation conduct", *Lamb Eng'g,* 103 F.3d at 1436, it is a fact that what took place in *Richardson* was a simple breach of fiduciary duty—as this Court has before it here.[27]

In an earlier case, *Rolax v. Atlantic Coast Line R.R. Co.,* the Fourth Circuit declined to overrule an award of attorneys' fees in a dispute involving the breach of a fiduciary duty of a union negotiating on behalf of black railroad firemen. 186 F.2d 473, 481 (4th Cir.1951). The Court stated that "[o]rdinarily, of course, attorneys' fees, except as fixed by statute, should not be taxed as part of the costs recovered by the prevailing party; but in a suit in equity where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases." *Id.* Five decades later, in 2000, the Fourth Circuit cited *Rolax* approvingly as having established an "essential to equity" exception to the American Rule—a decision which came after both *Alyeska* and *Chambers.* *Kreischer v. Kerrison Dry Goods,* 229 F.3d 1143 (4th Cir.2000) (table decision), *text available at* 2000 WL 1157805, at \*3. *Rolax* was also cited favorably in the Su-

---

26. The jury had found the appealing defendant liable for seventy percent of the damages. *Id.* at 128.

27. It is significant that *Richardson* was decided in 1976—*after* the Supreme Court's decision in *Alyeska,* which froze federal common law in this area.

preme Court's *Vaughan* opinion as a valid use of a court's equitable powers. 369 U.S. at 530, 82 S.Ct. 997.[28]

 Awarding attorneys' fees in a case such this ought not raise the hue and cry of those who fear that doing so would lead to a complete breakdown of the American Rule. *See Horizon Air,* 976 F.2d at 550; *Guevara,* 59 F.3d at 1503; *Rowe,* 870 F.2d at 293–95; Mallor, *supra,* at 632–38; *Rosenblum, supra,* at 1550–54. Breach of a fiduciary duty is not your everyday tort. As Justice Cardozo famously put it,

> Joint venturers like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.

*Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928). Massachusetts law likewise holds officers and directors of a corporation to a duty of "utmost good faith and loyalty." *Trade Stock Am., Inc. v. Millette,* No. 0201243, 2005 WL 1477216, at *5 (Mass.Super.Ct. Apr. 20, 2005) (McEnvoy, J.) (quoting *Donahue v. Rodd Electrotype Co.,* 367 Mass. 578, 593, 328 N.E.2d 505 (1975)). But *see Donahue,* 367 Mass. at 593–94, 328 N.E.2d 505 (explaining that,

in contrast to close corporations, there is a "somewhat less stringent standard of fiduciary duty to which directors … of all corporations must adhere in the discharge of their corporate responsibilities." (emphasis added)); *Gay v. Axline,* 23 F.3d 394 (1st Cir.1994) (table decision), text available at 1994 WL 159426. Even if the standard to which Citibank and Ziegler were held as directors of EIUG was "somewhat less stringent", however, it is without question that they were not "permitted to serve two masters whose interests are antagonistic." *Spiegel v. Beacon Participations, Inc.,* 297 Mass. 398, 411, 8 N.E.2d 895 (1937). This fundamental breach of trust is contrary to the duties which the law imposes as protections necessary for the proper functioning of our corporate economy and civil society. Breach of fiduciary duty is not akin to more personal torts. An expansion of the bad-faith exception into breaches of fiduciary duty, therefore, safely could be cabined there.

Additionally, awarding attorneys' fees in this case is rendered more compelling by the unique way in which the issue arose: an instruction, sua sponte, by the jury. The centrality of the jury to America's constitutional structure can hardly be denied. *See* U.S. Const. art. III, § 2, cl. 3; amends. V–VII; Akhil Reed Amar, *The Bill of Rights* 81–118 (1998) [hereinafter Amar, *Bill of Rights]*; 3 Story, *supra,* §§ 1773–76, at 652–57.[29] Though much of the focus on juries is in the realm of

---

**28.** It should be noted that the breaching union had been before the Supreme Court three times, losing each time, in litigation related to the events in *Rolax. See* 186 F.2d at 478. One might, then, categorize this case as similar to those allowing attorneys' fees where the defendant refuses to accede to the plaintiff in the face of a clear legal duty or even as akin to those involving the contempt power. The fact remains, however, that this was a case founded on a simple breach of fiduciary duty.

Moreover, it is interesting that the Fourth Circuit continues to adhere to its "essential to equity" exception to the American Rule, even in the face of the Supreme Court's decisions in *Alyeska* and *Chambers.*

**29.** Story, in turn, cites Blackstone, whose extended discussion of juries is among the most famous. *See* 3 Blackstone, *supra,* at 349–85.

criminal law, civil juries were similarly important to the founding generation.[30] The lack of provision in the Philadelphia document for civil juries was one of the most potent arguments of the Anti–Federalists in the ratification debate. Amar, *Constitution* at 233–36. The promise by Federalists quickly to amend the Constitution was essential to its passage, *id.*, and five of six states proposing amendments as part of their own ratification vote suggested that the Constitution protect civil juries, Amar, *Bill of Rights*, at 83; *see also* 3 Story, *supra*, § 1776, at 655–57.

The function of juries in the federal courts was to be the people's direct voice in that branch of the government. Thomas Jefferson declared that "it is necessary to introduce the people into every department of government.... Were I called upon to decide whether the people had best be omitted in the Legislative or Judicial department, I would say it is better to leave them out of the Legislative." *Id.* at 95. The Anti–Federalist Maryland Farmer described the jury as "the democratic branch of the judiciary power". *Id.* Juries,

according to the (also) Anti–Federalist Federal Farmer, secured the people's "just and rightful *controul* [sic] in the judicial department." *Id.* at 94 (emphasis added); *see also* 1 de Tocqueville, *supra*, at 282–83 ("The jury is, *above all*, a political institution, and it must be regarded in this light in order to be duly appreciated.... The institution of the jury consequently invests the people ... with the *direction* of society." (emphasis added)); *In re Acushnet River*, 712 F.Supp. at 1004–05. The recognition of the validity of these views by the proponents of ratification was crucial. *See supra.*

In the instant case, this Court has the benefit of the explicit instruction of the jury, relieving the Court of the burden of guessing the proper justice envisioned by its "democratic branch". The issue of damages calculation was of considerable concern to this jury, as evidenced by the lone—and sophisticated—question put to the Court during the jury's two-day deliberations.[31] It can only be concluded that the jury arrived at the figure "$654,585"

---

30. *See* 1 Alexis de Tocqueville, *Democracy in America* 281 n. 3 (Vintage Books 1990) ("Mr. Story, Justice of the Supreme Court of the United States, speaks, in his *Commentaries on the Constitution*, of the advantages of trial by jury in civil cases:

'The inestimable privilege of a trial by jury in civil cases,' says he, '[is] a privilege scarcely inferior to that in criminal cases, which is counted by all persons to be essential to political and civil liberty.' " (citation omitted)); *In re Acushnet River*, 712 F.Supp. at 1004 ("From its very infancy this nation has viewed the civil jury as essential to the model of democracy described and created by our Constitution."). Indeed, Blackstone's most thorough discussion on the topic relates to civil juries. See 3 Blackstone, *supra*, at 349–85.

31. The question is itself a seminar on proximate cause befitting a first-year law school course:

Questions for Judge Young.

1) Would you please restate the language of "proximate cause"
 —also proximate cause to what?
 —any financial/economic harm to EIU?
 —downfall of the company?
2) Is it correct to say that if, for example, a) we find that Mr. Zeigler breached his fiduciary responsibility, and b) if, in the parallel universe in which Mr. Zeigler did not breach his fiduciary responsibility, the company's fortunes may have been different, THEN the difference between these realities implies that this breach was in fact a proximate harm to economic damage? And that difference should be the amount awarded?
3) Following up to question 2, Are we, as jurors, being asked, then, if we find Mr. Zeigler breached his fiduciary responsibility, to predict the expected value of EIUG on the alternative reality in which he did not breach his duty?
 . . . .
Trial Exhibits, Jury Question 2.

(after evidence which might have justified damages of over $10,000,000) with particular care. By instructing that EIUG also be awarded "100% legal fees", the jury sought to protect its carefully calculated verdict by ensuring that EIUG alone received the benefit of that entire amount. Thus, one of the Supreme Court's concerns with a court exercising its inherent power—the lack of democratic control on it, *Roadway Express,* 447 U.S. at 764, 100 S.Ct. 2455—is conspicuously absent in this case.

" 'So what?' argues defense counsel. A jury's decision does not establish 'the law' . . . ." *Ciulla,* 89 F.Supp.2d at 100. True. But "once properly charged, the American jury may boldly go where no judge would dare to tread." *Id.* at 102. In providing jurors, by way of a general verdict, the power to decide both questions of fact and law—which is in this Court's discretion to utilize, see Fed.R.Civ.P. 49—courts necessarily cede some legal decisions to juries. See H. Ziesel, "The American Jury" in *Final Report: The American Jury System* 72 (Roscoe Pound & American Trial Lawyers Foundation, eds. 1977) ("The American jury must rank as a daring effort in human arrangement to work out a solution to the tensions between law and equity and anarchy." (internal quotation marks omitted)). This has never been a cause for great worry, however. The general verdict is constitutionally protected in criminal cases, thus allowing juries—the people's representatives in the judiciary—to give their final approval to the constitutionality and justness of a law. *Ciulla,* 89 F.Supp.2d at 100–01 ("In a very real sense . . . a jury verdict actually embodies our concept of 'justice.' "). Indeed, Justice Chase was impeached for not allowing defense counsel to argue constitutional law to the jury in a criminal case. Amar, *Bill of Rights, supra,* at 98–104. Surely it is not much more of a leap (and certainly of less consequence) to allow a jury to speak to the legal issue in the present case as well.[32]

Finally, it should be considered what behavior the Court's refusal to follow this jury's verdict would promote. As explained by Lord Denning: "There is also in the United States a right to trial by jury. These are prone to award fabulous damages. They are notoriously sympathetic *and know that the lawyers will take their forty percent before the plaintiff gets anything.*" *Davis, supra,* at 361 (emphasis added). No one likely could have objected successfully to a verdict of several million dollars in this case. The system only encourages inflated jury verdicts when it drives underground a jury's attempt to do complete justice by awarding attorneys' fees. Should we encourage this practice and ignore this honest jury, which, after two days of deliberation, decided that an award of attorneys' fees was appropriate here?

Moreover, we should consider the long-term consequences of ignoring the people's expression of justice in a purportedly democratic system. *See* 1 de Tocqueville, *supra,* at 284 ("Laws are always unstable unless they are founded upon the customs of a nation: customs are the only durable and resisting power in a people. . . . [The jury's] application is constantly visible; it affects all the interests of the community; everyone co-operates in its work: it thus penetrates into all the usages of life, it fashions the human mind to its peculiar forms, and is gradually associated with the idea of justice itself." (emphasis added)); *In re Acushnet River,* 712 F.Supp. at

---

**32.** *But see id.* at 101 n. (pointing out that the Seventh Amendment's provision of a civil jury explicitly refers to the jury's fact-finding role, where as the Sixth Amendment's provision for a criminal jury makes no such "limitation").

1004–06 ("All of our rules of law purport to be based on the collective values of the community.... Like all government institutions, our courts draw their authority from the will of the people to be governed. The law that emerges from these courts provides the threads from which all our freedoms are woven. It is through the rule of law that liberty flourishes. Yet, there can be no universal respect for law unless all Americans feel that it is *their* law. Through the jury, the citizenry takes part in the execution of the nation's laws, and in that way each can rightly claim that the law belongs partly to her." (internal quotation marks and citations omitted)). Perhaps this verdict—produced on the jury's own initiative—should be taken as a message that the judiciary's "preoccupation with stare decisis" on this issue, *Court Awarded Fees, supra,* at 642, is jeopardizing the public's respect of the law and its institutions.

It cannot be stressed enough what unique circumstances are presented in this case: (1) a sua sponte jury instruction awarding attorneys' fees; for (2) a breach of fiduciary duty; involving (3) bad faith.[33] Inherent in this formulation of the principle which ought be recognized are meaningful limitations on any award of attorneys' fees. There is no reason to believe that giving effect to the jury's instruction in this case would lead to a day where attorneys' fees are the norm in run-of-the-mill tort or contract cases.

## III. CONCLUSION

 Though there are reasons—good ones, in this Court's view—to heed the jury verdict, in light of the statements of courts higher than this, the Court believes it would be intellectually dishonest to stretch the bad-faith exception to the American Rule to cover the circumstances of this case. *Cf. Rumsfeld v. Forum for Academic and Institutional Rights,* 547 U.S. ——, 126 S.Ct. 1297, 1313, 164 L.Ed.2d 156 (2006). In light of the Court's review of the law, it is beyond this Court's power to award attorneys' fees in a simple breach of fiduciary duty case such as this one, where the alleged bad faith occurred solely in the events giving rise to the lawsuit itself.

If change is to come—and it should—that change, honoring a most conscientious American jury, must come at the Court of Appeals level. Accordingly, the Court DENIED EIUG's Motion to Alter or Amend Judgment [Doc. No. 185].

---

**33.** EIUG also attempts to distinguish the present case from the facts in *Cordeco,* where the First Circuit denied an award of attorneys' fees at least in part because the district court had also awarded punitive damages. "Punitive damages have been considered a more precise measure of a defendant's wrongful conduct than an award of fees...." *Cordeco,* 539 F.2d at 263. Moreover, such an award "constitue[d] double punishment". *Id.* EIUG argues that because there is no award of punitive damages here, there is no such similar concern. EIUG's Mot. at 5–6. Reading *Cordeco* more closely, however, the First Circuit also reserved the question of "whether the award of attorneys' fees under the 'bad faith' exception would be appropriate *in the absence of* an award of punitive damages." 539 F.2d at 263 n. 12 (emphasis added). How both of the First Circuit's concerns might be honored while also granting an award under the bad faith exception is "surpassingly difficult to conceive, as a theoretical matter". *United States v. Pacheco,* 434 F.3d 106, 113 (1st Cir.2006).